**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Jambys, Inc., *et al.*, | Case No. 24-10913 (KBO) |
| Debtors.[1] | Jointly Administered |

**BRIEF IN SUPPORT OF CONFIRMATION OF SUBCHAPTER V
DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are as follows Jambys, Inc. (4264) and Jambys NYC Inc. (5373). The Debtors' mailing address is 228 Park Avenue South, PMB 49630, New York, NY 10003.

## TABLE OF CONTENTS

IN THE UNITED STATES BANKRUPTCY COURT ............................................................... 1

PRELIMINARY STATEMENT ......................................................................................... 1

    I.   The Chapter 11 Cases ........................................................................................ 3
    II.  Debtors' Use of Cash Collateral .................................................................... 4
    III. The Adversary Proceeding ............................................................................. 6
    IV. The Plan ............................................................................................................. 9
    V.  The Plan Solicitation and Noticing Process ................................................ 12

ARGUMENT ................................................................................................................. 14

    I.   The Plan Should Be Confirmed Over the Remaining Objections. ............. 14

       A.    United First's Claims Are Unsecured. ................................................ 14

       B.    The Plan Is Fair and Equitable as to Unsecured Claims. ................. 20

       C.    The Third-Party Releases Are Consensual and Should Be Approved. ............. 22

       D.    The Plan Is Feasible. ........................................................................... 28

    II.  The Plan Satisfies the Disclosure Requirements of 11 U.S.C. § 1190. ....... 30
    III. The Plan Satisfies the Confirmation Requirements of a Non-Consensual Plan Under 11 U.S.C. § 1191(b). ........................................................................... 31
    IV. The Plan Satisfies the Applicable Provisions of 11 U.S.C. § 1129(a). ....... 31

       A.    The Plan Complies with Section 1129(a)(1). ...................................... 31

       B.    The Plan Complies with the Requirements of Section 1122. .............. 32

       C.    The Plan Satisfies the Mandatory Requirements of Section 1123(a). ............. 33

       D.    The Consensual Release Provisions and the Exculpation Provision Under the Plan Are Consistent with Section 1123(b). .......................................... 35

       E.    The Plan Complies with Section 1129(a)(2). ...................................... 41

       F.    The Plan Complies with Section 1129(a)(3). ...................................... 42

       G.    The Plan Complies with Section 1129(a)(4). ...................................... 43

       H.    The Plan Complies with Section 1129(a)(5). ...................................... 44

       I.    Section 1129(a)(6) Is Inapplicable. ..................................................... 44

       J.    The Plan Complies with Section 1129(a)(7). ...................................... 44

**K.**     **The Requirements of Section 1129(a)(8) are Inapplicable Because the Debtors Are Seeking Confirmation Pursuant to Section 1191(b) of the Bankruptcy Code.** ................................................................................................................ 45

**L.**     **The Plan Complies with Section 1129(a)(9).** ........................................................ 46

**M.**     **The Requirements of Section 1129(a)(10) Are Inapplicable Because the Debtors are Seeking Confirmation Pursuant to Section 1191(b) of the Bankruptcy Code.** 47

**N.**     **The Plan Complies with Section 1129(a)(11).** ...................................................... 48

**O.**     **Section 1129(a)(12) is Inapplicable.** ...................................................................... 48

**P.**     **Section 1129(a)(13) is Inapplicable.** ...................................................................... 49

**Q.**     **Section 1129(a)(14) is Inapplicable.** ...................................................................... 49

**R.**     **Section 1129(a)(15) is Inapplicable.** ...................................................................... 49

**S.**     **Section 1129(a)(16) is Inapplicable.** ...................................................................... 49

**T.**     **The Plan Meets All of the Confirmation Requirements Under Section 1191(b) and (c) of the Bankruptcy Code.** ............................................................................ 49

**CONCLUSION** .................................................................................................................... 52

## TABLE OF AUTHORITIES

Page(s)

Cases

09–12019 (CSS),
    2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) .................................................... 39
*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999) ................................................................................................... 44
*Frito-Lays Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*,
    10 F.3d 944 (2d Cir. 1993) ......................................................................................... 31
*Harrington v. Purdue Pharma, L.P.*,
    144 S. Ct. 2071 (2024) ............................................................................... 21, 22, 23
*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*,
    994 F.2d 1160 (5th Cir. 1993) ................................................................................... 28
*Iberiabank v. Geisen (In re FFS Data, Inc.)*,
    776 F.3d 1299 (11th Cir. 2015) ................................................................................. 27
*In re 203 N. LaSalle St. P'ship*,
    190 B.R. 567 (Bankr. N.D. Ill. 1995) ...................................................................... 50
*In re Aegean Marine Petroleum Network, Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y. 2019) ..................................................................... 39
*In re Arsenal Intermediate Holdings, LLC, et. al.*,
    2023 WL 2655592 (CTG) ........................................................................... 22, 24, 27
*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................................. 50
*In re Bally Total Fitness*,
    2007 WL 2779438 (Bankr. S.D.N.Y Sept. 7, 2007) ............................................... 41
*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004) ...................................................................................... 41
*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ........................................................................ 35
*In re Drexel Burnham Lambert Group, Inc.*,
    960 F.2d 285 (2d Cir. 1992) ...................................................................................... 39
*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..................................................................... 31
*In re Elsinore Shore Assocs.*,
    91 B.R. 238 (Bankr. D.N.J. 1988) ........................................................................... 43
*In re Enron Corp.*,
    326 B.R. 497 (S.D.N.Y. 2005) ........................................................................... 37, 39
*In re Essar Steel Minn.*,
    652 B.R. 709 (Bankr. D. Del. 2023) ................................................................ 22, 23, 24
*In re Exaeris, Inc.*,

380 B.R. 741 (Bankr. D. Del. 2008) ........................................................................................ 35
*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) .................................................................................... 50, 51
*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................................ 50
*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988) ..................................................................................... 43
*In re Ionosphere Clubs, Inc.*,
98 B.R. 174 (Bankr. S.D.N.Y. 1989) ...................................................................................... 31
*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987) .................................................................................................. 32
*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...................................................................................... 31
*In re K.D. Co., Inc.*,
254 B.R. 480 (B.A.P. 10th Cir. 2000) ..................................................................................... 26
*In re Landing Assoc., Ltd.*,
157 B.R. 791 (Bankr. W.D. Tex. 1993) .................................................................................. 28
*In re Madison Hotel Associates*,
749 F.2d 410 (7th Cir. 1984) .................................................................................................. 41
*In re Nite Lite Inns*,
17 B.R. 367 (Bankr. S.D. Cal. 1982) ...................................................................................... 42
*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ....................................................................................... 31
*In re Platinum Oil Props., LLC*,
465 B.R. 621 (Bankr. D.N.M. 2011) ....................................................................................... 26
*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) .............................................................................. 37, 39, 40, 41
*In re Resort Int'l, Inc.*,
145 B.R. 412 (Bankr. D.N.J. 1990) ........................................................................................ 43
*In re Sea Garden Motel and Apartments*,
195 B.R. 294 (Bankr. D. N.J. 1996) ....................................................................................... 28
*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010) ................................................................................. 35, 38
*In re Spansion*,
No. 09–10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. April 16, 2010) ............................ 39
*In re Sun Country Dev., Inc.*,
764 F.2d 406 (5th Cir. 1985) .................................................................................................. 42
*In re Texaco Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988) ...................................................................................... 41
*In re Toy & Sports Warehouse, Inc.*,
37 B.R. 141 (Bankr. S.D.N.Y. 1984) ...................................................................................... 31
*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ................................................................................. 38, 40
*In re World Health Alts., Inc.*,
344 B.R. 291 (Bankr. D. Del. 2006) ....................................................................................... 35
*IRS v. Kaplan (In re Kaplan)*,

104 F.3d 589 (3d Cir. 1997) ............................................................................ 28
*Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) ..................................................................... 31, 42
*Silverman v. Tracar, S.A. (In re Am. Preferred Prescription, Inc.),*
255 F.3d 87 (2d Cir. 2001) ............................................................................ 26
*Traders State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.),*
917 F.2d 1210 (9th Cir. 1989) ..................................................................... 42
*U.S. v. Energy Res. Co.,*
495 U.S. 545 (1990) ........................................................................................ 28
*United States v. Reorganized CF&I Fabricators, Inc.,*
518 U.S. 213 (1996) ........................................................................................ 44

**Statutes**

11 U.S.C. § 1122(a) ............................................................................... 31, 32
11 U.S.C. § 1123(b)(1)-(4), (6) .................................................................... 37
11 U.S.C. § 1183(c) ....................................................................................... 30
11 U.S.C. § 1190 ...................................................................................... 29, 30
11 U.S.C. § 1190(1)–(2) ................................................................................ 29
11 U.S.C. § 1191(b) .................................................................................. passim
11 U.S.C. §§ 1122 and 1123 ..................................................................... 31, 32
11 U.S.C. §§ 1126(c)–(d) ........................................................................ 20, 45
11 U.S.C. §§ 1129(a)(5)(A), (B) .................................................................... 43
11 U.S.C. §§ 1181(c),1192 ............................................................................ 30
28 U.S.C. § 1930 ....................................................................................... 48, 49
Bankruptcy Code Section 1182(1) ................................................................... 2
section 510(a) of the Bankruptcy Code ...................................................... 8, 14
section 552 of the Bankruptcy Code ............................................................... 19
Section 1114 of the Bankruptcy Code ............................................................. 48
Section 1123 of the Bankruptcy Code ............................................................. 35
Section 1123(a) .............................................................................................. 32
Section 1123(a)(1) .......................................................................................... 32
Section 1123(a)(2) .......................................................................................... 32
Section 1123(a)(3) .......................................................................................... 33
Section 1123(a)(4) ..................................................................................... 33, 51
Section 1123(a)(5) .......................................................................................... 33
Section 1123(a)(6) .......................................................................................... 34
Section 1123(a)(7) .......................................................................................... 34
Section 1123(a)(8) .......................................................................................... 34
Section 1123(b) ..................................................................................... 34, 37, 38
Section 1123(b)(3)(A) of the Bankruptcy Code ............................................. 35
Section 1126 of the Bankruptcy Code ............................................................. 11
Section 1129 of title 11 of the United States Code .......................................... 1
Section 1129(a) ....................................................................... 30, 31, 45, 47
Section 1129(a)(1) .......................................................................................... 31
Section 1129(a)(2) of the Bankruptcy Code .................................................... 41
Section 1129(a)(3) ..................................................................................... 41, 42

Section 1129(a)(4) ....................................................................................................... 42, 43
Section 1129(a)(5) ........................................................................................................... 43
Section 1129(a)(6) ........................................................................................................... 43
Section 1129(a)(7) ........................................................................................................... 44
Section 1129(a)(8) ........................................................................................................... 45
Section 1129(a)(9) ............................................................................................. 28, 45, 46
Section 1129(a)(9)(C) ...................................................................................................... 46
Section 1129(a)(10) ......................................................................................................... 47
Section 1129(a)(11) of the Bankruptcy Code ......................................................... passim
Section 1129(a)(12) ......................................................................................................... 48
Section 1129(a)(13) ......................................................................................................... 48
Section 1129(a)(14) ......................................................................................................... 48
Section 1129(a)(15) ......................................................................................................... 49
Section 1129(a)(16) ......................................................................................................... 49
Section 1129(b) ............................................................................................................... 50
Section 1141(a) of the Bankruptcy Code ........................................................................ 26
Section 1141(d) ............................................................................................................... 30
Section 1181(a), Section 1129(a)(15) of the Bankruptcy Code ...................................... 49
Section 1190(1)(A) of the Bankruptcy Code .................................................................. 30
Section 1190(1)(B) of the Bankruptcy Code .................................................................. 30
Section 1190(1)(C) of the Bankruptcy Code .................................................................. 30
section 1191 of the Bankruptcy Code ............................................................................. 20
Section 1191(a) of the Bankruptcy Code ........................................................................ 30
Section 1191(b) and (c) of the Bankruptcy Code ........................................................... 49
Section 1191(c) of the Bankruptcy Code .................................................................. passim
Sections 1107 and 1108 of the Bankruptcy Code ............................................................. 2
Sections 1129(a)(8) and 1129(a)(10) .............................................................................. 30
Sections 1129(a)(8), (10), and (15)................................................................................. 30
U.S.C. § 1191(c) ............................................................................................................. 21

Rules

*Fed. R. Civ. P. 12(b)(1), (3), and (6)* ............................................................................. 7
*Fed. R. Civ. P. 12(b)(3) and (6)* .................................................................................... 7

Other Authorities

08-4191 (GEB),
    2009 U.S. Dist. LEXIS 13574, at *78 (D.N.J. Feb. 20, 2009)................................ 42
H.R. Rep. No. 95-595 ...................................................................................................... 31
S. Rep. No. 95-989........................................................................................................... 31
Tr. 62................................................................................................................................ 27

The above-captioned debtors and debtors in possession, Jambys, Inc. and Jambys NYC Inc. (collectively, the "Debtors"), hereby submit this memorandum of law (the "Confirmation Brief") filed in support of confirmation of the *Subchapter V Debtors' First Amended Plan of Reorganization* [D.I. 138] (as may be modified, amended, or supplemented from time to time, the "Plan"),[1] filed on September 6, 2024, pursuant to Section 1129 of title 11 of the United States Code ("Bankruptcy Code") and in response to the United First Objection and the UST Objection (each as defined below), and respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The Debtors stand poised to confirm a Plan that represents the successful resolution of these Chapter 11 Cases.  The Plan provides a meaningful recovery to both secured and unsecured creditors.  It has the full support of the Subchapter V Trustee, the Debtors' senior secured creditor, Settle, and received accepting votes from a majority of Holders of General Unsecured Claims that actually voted (and those that will continue business with the Debtors post-confirmation).  The Plan is a testament to the value the provisions of Subchapter V can provide to small business debtors generally, and should be confirmed.

2.      United First is an unsecured creditor for a host of reasons as more fully described below.  To begin, to the extent that United First is asserting a lien as a secured creditor, its rights in collateral are subordinate to the perfected first priority lien of Talent Art and Settle under the Final Cash Collateral Order whose findings and stipulations it did not timely challenge.  Moreover, because Talent Art (and Settle) were vastly undersecured, even if United First holds a perfect security interest (which it does not), that interest has no value and is therefore ***entirely*** unsecured.  But even if United First is asserting a true ownership interest in accounts receivable

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

(as distinct from a lien on the ***Debtors'*** property), it fares no better.   To begin, United First has taken no affirmative action, such as filing an adversary proceeding (or obtaining any adjudication), to establish its purported ownership interests throughout this case and, instead, rather than litigating the merits of these claims (which the Debtors were prepared to do), United First stipulated having its alleged receivables (and the proceeds of such receivables) used by the Debtors throughout the case.   Furthermore, having consented to the Debtors' use of the proceeds, it is highly speculative how much, if any, of these proceeds remain and, certainly, such speculative interest is insufficient grounds for the Court to deny confirmation of an otherwise confirmable plan.   Finally, United First's argument that it owns these receivables is just plain wrong as a matter of law as United First's alleged receivable purchases are nothing more than disguised security interests under applicable law.

3.      With respect to the UST Objection, the only live issue before the Court is whether the five (5) Holders of General Unsecured Claims and one (1) Holder of Secured Claims that voted to accept the Plan were given the appropriate ability to consent to the Third-Party Releases through the opt-out box (including one that *did* affirmatively opt out), a mechanism this Court specifically approved in *Cano* over objection of the United States Truste and remains undisturbed after *Purdue*. These are the <u>only</u> parties that are deemed to give the third-party releases under the Plan if they failed to opt out.  Unimpaired Creditors and Holders of Impaired Claims that chose not to vote are <u>not</u> bound, and, similarly, all those Creditors that voted to reject had the ability to <u>opt-in</u> to the releases, consistent with this Court's ruling in *Emerge* (none did).   Therefore, and as is further discussed below, the opt-out mechanism for accepting voters should be approved in these Chapter 11 Cases.

## **<u>BACKGROUND</u>**

## I.      **The Chapter 11 Cases**

4.       On April 30, 2024 (the "Petition Date"), the Debtors commenced their cases (the "Bankruptcy Cases") with the intention of confirming a plan of reorganization as debtors defined in Bankruptcy Code Section 1182(1), and the Debtors elected to proceed under Subchapter V of Chapter 11 of the Bankruptcy Code pursuant to the Small Business Debtor Reorganization Act, as amended.

5.       On April 30, 2024, Mr. David M. Klauder was appointed as the Subchapter V Trustee (the "Subchapter V Trustee").  No other trustee, examiner, or official committee has been appointed in these cases.  The Debtors are operating their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.       On April 30, 2024, the Debtors filed the *Declaration of John Ambrose in Support of First Day Relief* [D.I. 8] (the "First Day Declaration").  The First Declaration provided that "[a]s of the Petition Date, Jambys, Inc. has secured debt totaling approximately $1,000,000.00, which consists of a $1M secured note held by Talent Art Fashion Design Ltd. a China limited company ("Talent Art" or the "Prepetition Secured Party").  While two other lenders, SellersFundingCorp. ("SellersFi") and Clear Finance Technology Corporation ("ClearCo"), provided Jambys, Inc. with loans in the amount of approximately $220,000, and $240,000, respectively, and filed UCC-1 financing statements in Delaware to perfect their security interests, the Debtors believe the value of their assets do not materially exceed the secured claims of Talent Art."  *See* D.I. 8 ¶ 14.

7.       During these Chapter 11 Cases, the Debtors retained certain professionals to implement their restructuring.  To this end, the Debtors filed the *Debtors' Application to Employ and Retain The Finley Group as Financial Advisor to Debtors Nunc Pro Tunc to the Petition Date* [D.I. 43].  The Court entered an order approving the retention of The Finley Group on May 30,

2024 [D.I. 59].  Additionally, on June 19, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order Approving Procedures for the Retention and Compensation of Ordinary Course Professionals* [D.I. 92].  On June 28, 2024, the Court entered the *Order Approving Procedures for the Retention and Compensation of Ordinary Course Professionals Nunc Pro Tunc to the Petition Date* [D.I. 104] (the "OCP Order").  Pursuant to the OCP Order, the Debtors retained special Mexican counsel, Ramírez, Gutiérrez-Azpe, Rodríguez-Rivero y Hurtado, S.C., to advise on issues related to certain inventory located in Mexico as of the Petition Date.

## II.     **Debtors' Use of Cash Collateral**

8.      On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Party; and (III) Granting Related Relief* [D.I. 7] (the "Cash Collateral Motion"), which sought, among other things, to authorize the Debtors to use Cash Collateral in which Talent Art has an interest, and granting adequate protection to the Prepetition Secured Party with respect to the use of its Cash Collateral.

9.      On May 29, 2024, United First, LLC ("United First") filed its *Objection of United First, LLC to Debtors' Motion for Use of Cash Collateral* [D.I. 52] (the "United First Cash Collateral Objection").  On June 20, 2024, Velocity filed its *Objection of Velocity Capital Group, LLC to Debtors' Motion for Use of Cash Collateral* [D.I. 94] (the "Velocity Cash Collateral Objection" and together with the United First Cash Collateral Objection, the "Cash Collateral Objections").  In the Cash Collateral Objections, United First and Velocity objected to, among other things, the Debtors' use of Cash Collateral to the extent the Debtors sought to use "future receipts," defined to include "all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card, … or other form of monetary payment in the

ordinary course of [the Debtors'] business" until the "Purchased Amount of Future Receipts" is paid in full (the "Future Receipts").  *See* D.I. 52 ¶ 1.

10.     On June 28, 2024, the Debtors filed the *Debtors' Omnibus Reply in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Party, and (III) Granting Related Relief* [D.I. 103], a copy of which is attached hereto as **Exhibit A** and incorporated herein by reference (the "Cash Collateral Reply") in response to the Cash Collateral Objections.  As the Debtors discussed in depth in the Cash Collateral Reply, on June 9, 2022, Talent Art entered into a Subordination Agreement with Settle, Inc. ("Settle") (the "Subordination Agreement"), pursuant to which Talent Art agreed that its obligations would be subordinate and junior in right of payment, and all other rights of Settle regarding any obligations owed to Settle.  *See* D.I. 103 ¶ 12.  Pursuant to the Subordination Agreement, Talent Art agreed that the Debtors' obligations to Talent Art shall be subordinate and junior in the right of payment and all other rights of Settle.  *See* Ex. A at Ex. 1 ¶ 2(a).

11.     In the Cash Collateral Reply, the Debtors demonstrated that the Cash Collateral Objections should be overruled because, among other things and as further detailed below, United First failed to properly perfect their security interest in the Future Receipts, rendering them subordinate to the Talent Art Liens on all of Jambys, Inc.'s assets and therefore not entitled to adequate protection.  *See* D.I. 103 ¶¶ 3, 53.

12.     On July 2, 2024, the Debtors filed the *Notice of Filing of Further Revised Proposed Final Order (I) Authorizing the Debtors to Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Party; and (III) Granting Related Relief* [D.I. 109] (the "Revised Proposed Cash Collateral Order"), which contained agreed-upon language between

United First, Velocity, and the Debtors regarding use of cash collateral. *See* D.I. 109 ¶ 1.

13.     On July 3, 2024, the Court entered the *Final Order (I) Authorizing the Debtors to Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Party; and (III) Granting Related Relief* [D.I. 114] (the "Final Cash Collateral Order") on a fully consensual basis.  The Final Cash Collateral Order resolved the Cash Collateral Objections with respect to the Debtors' use of Cash Collateral and reserved the parties' rights regarding whether the Future Receipts are (i) property of the Debtors or their Estates, or (ii) property of United First or Velocity in accordance with their respective MCA Agreements.  The Final Cash Collateral Order further resolved certain disputes and reserved the rights of the Debtors, Talent Art, and Settle concerning the Cash Collateral, the Subordination Agreement, and Interim Adequate Protection Payments.  The Final Cash Collateral Order contains a finding that Talent Art holds "valid, binding, enforceable, non-avoidable, and properly perfected first-priority liens on essentially all of the Debtors' property located in the United States as of the Petition Date.  *See* D.I. 114 at ¶¶ G(i), (ii), 5.  By virtue of the Subordination Agreement Settle is entitled to assert Talent Art's rights to payment with respect to the proceeds of the Talent Art Encumbered Collateral, up to the amount of Settle's claim of $1,73,217.29.  *See* D.I. 114 at ¶¶ G(i)-(iii).

### III.    The Adversary Proceeding

14.     Shortly after the Petition Date, on May 9, 2024, the Debtors initiated an adversary proceeding (the "Adversary Proceeding") by way of the *Debtors' Verified Complaint for Injunctive Relief* [Adv. D.I. 1] (the "Adversary Complaint") against the MCA Lenders and their associates seeking to declare as void the MCA Loans and any security interests and/or liens derived therefrom, as well as to avoid any preferential and/or fraudulent transfers of Debtor assets paid to the MCA Lenders pursuant to the MCA Loans.  The Adversary Complaint also sought to extend

the automatic stay to the Founders and to enjoin the MCA Lenders from enforcing the personal guarantees against the Founders pending a final determination on the merits of the MCA Loans' validity.[2]  [Adv. D.I. 1].  On the same date, the Debtors filed the *Debtors' Emergency Motion for an Order (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Pending a Final Hearing* [Adv. D.I. 4] (the "<u>Stay Motion</u>") seeking the preliminary relief described above on an emergency basis.  [Adv. D.I. 2-5].  The Court held an emergency hearing on May 10, 2024, and entered a temporary restraining order (the "<u>TRO</u>") granting the Stay Motion as to the Velocity Action for fourteen days, pending a more fulsome preliminary injunction hearing scheduled for May 23, 2024 (the "<u>P.I. Hearing</u>").  [Adv. D.I. 15].  The Stay Motion was unopposed. The Court determined that that all of the relevant factors weighed in favor of extending the automatic stay to the Founders and granting a preliminary injunction as to all MCA Lenders pending final determination on the merits of the validity of the MCA Loans, and entered an order to that effect on May 23, 2024 (the "<u>P.I. Order</u>").  [Adv. D.I. 24].

15.    On June 4, 2024, the Debtors filed the *Debtors' First Amended Verified Complaint For Injunctive Relief* [Adv. D.I. 26] (the "<u>Amended Complaint</u>").  The Amended Complaint named additional defendants related to the MCA Lenders and contained two new counts asserting violations of the federal Racketeer Influenced and Corrupt Organizations ("<u>RICO</u>") statute, targeted toward the MCA Lenders and their owners and associates (collectively, the "<u>MCA RICO Defendants</u>").

---

[2]    The Adversary Complaint also named as a defendant SellersFundingCorp. ("<u>SellersFi</u>"), another lender whose contractual terms the Debtors have acknowledged as legitimate, solely for the purposes of enjoining SellersFi from enforcing the personal guarantee against the Founders pending the confirmation of the Plan.  On June 14, 2024, the Debtors agreed to dismiss SellersFi from the Adversary Proceeding in exchange for a stipulation that SellersFi would continue to abide by the terms of the Court's P.I. Order.  [Adv. D.I. 29].

16.     On August 2, 2024, certain defendants in the Adversary Proceeding, including United First, filed the *Defendants United First, LLC, Global Funding Experts, LLC, GFE NY, LLC, Boris Musheyev and Vlacheslav Eliyayev, Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), (3), and (6)* [Adv. D.I. 38] (the "United First Motion to Dismiss").  The same day, Velocity filed the *Motion to Dismiss of Defendants Velocity Capital Group, LLC and Jay Avigdor Pursuant to Fed. R. Civ. P. 12(b)(3) and (6)* [D.I. 40] (the "Velocity Motion to Dismiss," together with the United First Motion to Dismiss, the "Motions to Dismiss."). On August 16, 2024, the Debtors filed the *Debtors' Memorandum of Law in Opposition to the Motion to Dismiss of United First, LLC, Global Funding Experts, LLC, GFE NY LLC, Viacheslav Eliyayev and Boris Musheyev, and the Motion to Dismiss of Velocity Capital Group LLC and Jay Avigdor* [Adv. D.I. 45] (the "Opposition to Motion to Dismiss.").

17.     In the Opposition to the Motion to Dismiss, the Debtors noted that under the Final Cash Collateral Order, Talent Art holds "valid, binding, enforceable, non-avoidable, and properly perfected first-priority liens on essentially all of the Debtors' property located in the United States as of the Petition Date."  *See* Adv. D.I. 45 ¶ 19 (citing D.I. 114 ¶ G(i), (ii) 5), which rights Settle is permitted to assert pursuant to the Subordination Agreement (which is enforceable in bankruptcy pursuant to section 510(a) of the Bankruptcy Code).  Because Talent Art (and Settle, by virtue of its rights under the Subordination Agreement) is owed far more than the value of the Debtors' property located in the United States as of the Petition Date, "the Final Cash Collateral renders the Proofs of Claim fully unsecured."  *Id.*

18.     The Adversary Proceeding remains ongoing as to United First.  However, the Debtors and Velocity have reached an agreement in principle to settle their claims against each other.  Though a formal settlement agreement has yet to be executed, its framework includes the

8

following material terms:  (i) the Debtors shall dismiss Velocity and its principal Jay Avigdor from the Adversary Proceeding; (ii) Velocity shall withdraw all of its Proofs of Claim; (3) mutual releases shall be executed between Velocity and the Debtors (including the release of any and all Liens); and (4) mutual releases shall be executed between Velocity and the Jambys Officers (including the release of any personal guarantees).  Moreover, for the avoidance of doubt, to the extent that any arguments contained within the currently pending motion to dismiss filed by Velocity [Adv. D.I. 40] (the "Velocity MTD") have not been rendered moot by the Debtors' dismissal of Velocity and Jay Avigdor from the Adversary Proceeding, Velocity shall withdraw the Velocity MTD without prejudice to the motion to dismiss filed by United First [Adv. D.I. 38] (the "United First MTD").

19.     The Debtors will seek approval of this settlement with Velocity by way of a separate Bankruptcy Rule 9019 Motion to be filed after confirmation.

**IV.     The Plan**

20.     On July 29, 2024, the Debtors timely filed their *Subchapter V Debtors' Plan of Reorganization* [D.I. 121] (the "Initial Plan").

21.     On September 6, 2024, the Debtors filed an amended Plan reflecting the Debtors' agreements with Settle and addressing certain concerns raised in the UST Objection.  The Plan contemplates dedication of all of the Debtors' projected Disposable Income over a period of five (5) years (and including any recoveries on account of the Adversary Proceeding) toward payment of Allowed Administrative Claims and Allowed General Unsecured Claims, with Priority Tax Claims paid in full.  Furthermore, the Plan contemplates that holders of Equity Interests will retain those Equity Interests as they existed at the commencement of these cases.

9

22.     On July 30, 2024, the Court entered the *Order (I) Scheduling a Hearing on Plan Confirmation and Deadlines Related Thereto: (II) Approving the Solicitation, Notice and Tabulation Procedures and the Forms Related Thereto; and (III) Granting Related Relief* [D.I. 123] (the "Solicitation Order"), which, among other things, set the hearing to consider the confirmation of the Plan ("Confirmation").

23.     The Debtors' counsel caused solicitation materials, notice of the deadline for objecting to confirmation of the Plan, and related notices, forms, and Ballots to be distributed on July 30, 2024, and continuing thereafter (the "Solicitation Packages"), as evidenced by the related Affidavit of Service [D.I. 126].

24.     On August 27, 2024, the Debtors filed the Plan Supplement [D.I. 132] (the "Plan Supplement"), which contained the Assumed Executory Contract List and the Rejected Executory Contract List, which was served on August 27, 2024, as evidenced by, among other things, the related Affidavit of Service [D.I. 133]

25.     On September 3, 2024, the Office of the United States Trustee for the District of Delaware (the "United States Trustee") filed the United States Trustee's Objection to Confirmation of the Subchapter V Debtors' Plan of Reorganization [D.I. 134] (the "UST Objection").

26.     On September 3, 2024, Settle filed *Secured Creditor Settle, Inc.'s Limited Objection to Debtors' Plan of Reorganization and Reservation of Rights* [D.I. 135] (the "Settle Objection"). Debtors have come to a resolution with Settle and the Settle Objection has not been withdrawn by the time of filing of the Confirmation Brief, but it soon will be.

27.     Also on September 3, 2024, United First and Velocity filed the *Objection of United First, LLC and Velocity Capital Group, LLC to Confirmation of Subchapter V Debtors' Plan of Reorganization* [D.I. 137] (the "United First Objection") (together with the UST Objection and

10

the Settle Objection, the "Objections").  Velocity will withdraw its Objection.  The Debtors' reply to the remaining Objections (as to Settle and United First) is incorporated herein.

28.    On September 6, 2024, the Debtors filed the *Certification of Ballots and Related Voting Matters* [D.I. 140] (the "Voting Declaration") to certify the tabulation of votes in connection with the Plan.

29.    Contemporaneously with the filing of this Confirmation Brief, the Debtors are filing the *Declaration of John Ambrose in Support of Confirmation of Subchapter V Debtors' First Amended Plan of Reorganization* (the "Confirmation Declaration") [D.I. 141] and the proposed Confirmation Order as an exhibit to the *Notice of Proposed Findings of Fact, Conclusions of Law, and Order Confirming Subchapter V Debtors' First Amended Plan of Reorganization* (the "Proposed Confirmation Order").

30.    The Plan contains certain releases including a Debtors' Release provision, a consensual third-party release provision, an exculpation provision, and an injunction provision. As discussed in greater detail below, these provisions are appropriate and consistent with the applicable provisions of Chapter 11, the law in this Circuit, and are the product of good-faith, arms-length negotiations among the Debtors (with the assistance of their professionals) and certain of their significant stakeholders.  Each party receiving a release made substantial, meaningful contribution to these cases and the Plan.  The releases are integral and necessary to the Plan.

31.    To that end, the Debtors and Settle (the Debtors' first-priority senior secured creditor with respect to the Talent Art Encumbered Collateral) have agreed to an arrangement favorable to the Debtors pursuant to which (i) the Reorganized Debtors shall make the first Distribution to Settle in the amount of $20,000 within seven (7) days of the Effective Date, and (ii) any amounts received by Settle from Talent Art on account of Interim Adequate Protection

Payments shall be offset against the $156,538.68 of Secured Claims with respect to the Talent Art Encumbered Collateral.

32. Confirmation of the Plan represents the best avenue for the Debtors to maximize value for the benefit of stakeholders. Because the Plan also otherwise satisfies the legal requirements for confirmation, the Debtors respectfully submit that the Objections should be overruled and the Plan should be confirmed.

**V.**     **The Plan Solicitation and Noticing Process**

33. Pursuant to Section 1126 of the Bankruptcy Code, holders of Class 1 Secured Claims and Class 2 General Unsecured Claims are Impaired classes that are entitled to vote on the Plan. *See* 11 U.S.C. § 1126.

34. The following table summarizes the Classes of Claims and Equity Interests under the Plan and whether such Classes are entitled to vote to accept or reject the Plan:

| Class | Description | Treatment | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 1 | Secured Claims | Holders of Secured Claims shall (a) retain the valid and perfected liens on Encumbered Collateral securing such Secured Claims to the extent of the Allowed amount of such Secured Claims; and (b) receive on account of such Secured Claim deferred cash payments totaling at least the Allowed amount of such Secured Claim, of a value, as of the Effective Date, of at least the value of such Holder's interest in the Encumbered Collateral. The Reorganized Debtors shall make the first Distribution to Secured Creditors A in the amount of $20,000 within seven (7) days of | Impaired | Yes |

| Class | Description | Treatment | Impairment | Entitled to Vote |
|-------|-------------|-----------|------------|------------------|
| | | the Effective Date.[3]  Any amounts received by Settle from Talent Art on account of Interim Adequate Protection Payments shall be offset against the $156,538.68 of Secured Claims with respect to the Talent Art Encumbered Collateral.  Settle shall give written notice to the Reorganized Debtors within seven (7) days of Settle's receipt of such amounts. | | |
| 2 | General Unsecured Claims | To be paid in pro rata quarterly installments from Disposable Income commencing in 2027 and ending on the Last Distribution Date. | Impaired | Yes |
| 3 | Equity Interests | Maintain Existing Equity | Unimpaired | No (Presumed to Accept) |
| | | | | |

35.     The voting results, as reflected in the Voting Declaration, are summarized as follows:

| Total Ballots Counted | | | | | |
|----|----|----|----|----|----|
| **Voting Class** | **Accepting** | | **Rejecting** | | **Class Voting Results** |
| | **Number (Percentage Accepting)** | **Amount** | **Number** | **Amount** | |
| Class 1 Secured Claims | 1 (100%) | $1,763,217.28 | 0 (0%) | $0.00 | Accepting |

---

[3]   This amount accounts for additional value realized in the Talent Art Encumbered Collateral as of the Effective Date and in exchange for the withdrawal of Settle's objection to the Plan.

13

| Class 2 General Unsecured Claims | 5 (62.50%) | $85,494.06 | 3 (37.50%) | $1,531,354.39 | Rejecting |
|---|---|---|---|---|---|

36.     As set forth above and in the Voting Declaration, Classes 1 and 2 are the only classes entitled to vote under the Plan.  Because Settle voted to accept and was the only received ballot in Class 1, Class 1 has accepted the Plan.  Five Holders of General Unsecured Claims, representing 62.5% of ballots actually submitted by Holders of such General Unsecured Claims (Class 2), voted to accept the Plan, and 37.5% of the dollar amount voted to reject the Plan. Therefore, Class 2 voted to reject the Plan.

## **ARGUMENT**

### I.     **The Plan Should Be Confirmed Over the Remaining Objections.**

37.     As discussed above, Settle and Velocity have agreed with the Debtors in principal to withdraw their objections to confirmation of the Plan.  As such, only the UST Objection and the United First Objection are currently before this Court.  First, the Debtors will address the specific issues raised in the remaining Objections in turn.  Then, the Debtors will demonstrate that they have met their burden to establish that the Plan meets all applicable requirements for confirmation under the Bankruptcy Code.

### A.     **United First's Claims Are Unsecured.**

38.     There is no question that United First is an unsecured creditor (if it was ever secured at all, which the Debtors contest), as the Debtors have consistently asserted throughout the Chapter 11 Cases.  *See, e.g.*, D.I. 8 (the First Day Declaration), D.I. 103 (the Cash Collateral Reply), D.I. 114 (the Cash Collateral Order), and Adv. D.I. 45 (the Opposition to Motion to Dismiss).

39.     United First bears the burden of proof to establish the extent and validity of their interests in the Future Receipts.  They failed to do so in their objection to the Cash Collateral Motion and have not made any new arguments or presented any evidence in their confirmation objection.

40.     ***First***, to the extent that United First is arguing that it holds a <u>secured claim</u> against the Debtors (meaning that it alleges some time of lien or security on property of the Debtors) that entitles it to be treated as a secured creditor under the Plan, it can no longer assert such claim by virtue of the Final Cash Collateral Order, which is law of the case and precludes any argument by United First that it holds ***any*** secured claim against the Debtors whatsoever

41.     The Final Cash Collateral Order provided that as of the Petition Date, "(a) the Talent Art Liens were and are valid, binding, enforceable, non-avoidable, and properly perfected on all Talent Art Collateral located in the United States as of the Petition Date . . . (the "<u>Talent Art Collateral</u>") [and . . . . ] (b) the Talent Art Liens were senior in priority over and all other liens on the Talent Art Encumbered Collateral [which includes all accounts and accounts receivable of the Debtors]" and that such liens were not subject to any challenge.  *See* D.I. 114 ¶ G(ii).  Moreover, pursuant to the Subordination Agreement, Settle "was permitted under section 510(a) of the Bankruptcy Code and other applicable law to exercise any rights of Talent Art."  *Id*. ¶ K.  The Final Cash Collateral Order likewise made clear that any rights existing between Talent Art and the Debtors "shall apply to Settle as if Settle were Talent Art" because Settle stepped into Talent Art's shoes as the senior lienholder pursuant to the Subordination Agreement**.**

42.     Not only did the Final Cash Collateral order stipulate that Talent Art (and Settle by virtue of the Subordination Agreement) held a valid, first priority, perfected security interest in the Talent Art Collateral (including collateral in the United States), the order made it perfectly clear

that Talent Art (and, again, Settle) was a dramatically undersecured creditor.  Specifically, the Debtors stipulated that, as of the date of the Final Cash Collateral Order, the Talent Art Obligations were no less than $959,250 in principal and interest (*see* D.I. 114, at ¶ G.1), while the Talent Art Encumbered Collateral was valued at the approximate amount of $136,538.68 (*see id.*).[4]

43.     If any party wished to challenge the priority, validity, enforceability or perfection of the Talent Art Liens or the Talent Art Obligations, it had the ability *and duty* to do so within the seventy-five (75) day Challenge Period (as defined in the Final Cash Collateral Order).

44.     United First (a sophisticated party engaged primarily in the business of commercial financing and is represented by sophisticated counsel who regularly represents MCA lenders) received notice of the Cash Collateral Motion and all related filings, filed an objection, and then negotiated language that was included in the Final Cash Collateral Order resolving its objection. *See* D.I. 114 ¶ l.  United First did not, however, challenge the validity, extent, or priority of the Talent Art Liens during the Challenge Period.  United First is therefore bound by the findings in the Final Cash Collateral Order and foreclosed from arguing that its claims are secured by first priority lien in the Future Receipts (or otherwise).

45.     As a result, Talent Art (and Settle through its subordination rights) has a valid perfected, first priority lien and security interest in the Talent Art Encumbered Collateral that is senior to the claim of any other person or entity, including United First.  Also, because Talent Art (and Settle) is dramatically undersecured, even if United First holds a junior perfected security interest in any portion of the Talent Art Encumbered Collateral (which it does not), the value of

---

[4] Settle held a claim in the amount of $1,763,217.29 per the Final Cash Collateral and, was therefore entitled to assert all of Talent Art's rights and claims per the Subordination Agreement.

its secured claim is $0 by virtue of the Final Cash Collateral Order and it is therefore an unsecured creditor.

46.     Moreover, and to be clear, although there were certain stipulations made between in the Final Cash Collateral Order reserving various rights of the Debtors and United First, absolutely nothing in those stipulations excused or excepted United First from its obligation to file a timely challenge disputing the validity or priority of the Talent Art Liens during the Challenge Period.

47.     *Second*, to the extent that United First asserts that it is the <u>owner</u> of the alleged accounts and accounts receivable, such bald allegations are clearly insufficient for this Court to deny confirmation of the Plan.

48.     To begin, United First bears the burden of proof to establish the extent and validity of their interests in the Future Receipts.  It failed to do so in its objection to the Cash Collateral Motion (which the Debtors were ready to litigate) and has not made any new arguments, presented any evidence in its confirmation objection, or filed an adversary proceeding, to obtain a determine of its alleged rights. Consequently, the Court should not let the "tail wag the dog" and hold up confirmation while United First sits on the sidelines and alleges that it owns these accounts yet has done nothing to establish such alleged rights.

49.     *Third*, it is hard to imagine that there are any pre-petition accounts or accounts receivable that could be subject to United First's claim to ownership – and, certainly, United First has done <u>nothing</u> in the Debtors' bankruptcy cases or its confirmation objection to identify these amounts.  Under the Final Cash Collateral Order, United First agreed that "nothing herein shall restrict the Debtors' use of all accounts or accounts receivable generated by the Debtors (including any receipts or proceeds thereof) in accordance with the terms of this Final Order, ***regardless of***

*whether the MCA Objectors contend that such property constitutes Disputed Accounts Property*." D.I. 114, at ¶ K.1 (emphasis added).  The existence of this provision in the Final Cash Collateral Order was not an accident but, rather, a hard-won concession obtained by the Debtors who were fully ready to litigate the merits of United First's objection to the use of cash collateral.

50.     Because the Debtors were permitted to spend and use these receivables during their Bankruptcy Cases under the Final Cash Collateral Order and because United First has presented no evidence that any of these accounts or accounts receivable remain in the Debtors's possession, there is no reason whatsoever to hold up confirmation over such speculative assertion.  Moreover, to the extent that United First wishes to raise the ownership issue in the parties' Adversary Proceeding (subject, of course, to the Court's prior determinations and rulings in the Final Cash Collateral Order) it is free to do so.

51.     *Fourth*, United First's argument that it owned certain of the Debtors' accounts receivable is dead wrong as a matter of law.  As discussed below and in the Cash Collateral Reply, United First did not own these accounts.  Rather, at best, it took a security interest in these accounts (and a security interest which, incidentally, it did not properly perfect).  As the holder of a security interest/lien United First is, as explained above, an unsecured creditor pursuant to the Final Cash Collateral Order and remains subject to the first priority lien of Talent Art in such accounts and accounts receivable (and collection rights of Settle under the Subordination Agreement).

52.     Indeed, the Debtors thoroughly briefed (and were ready to litigate) United First's unsecured status in connection with the Cash Collateral Objections.  Rather than re-hashing the full analysis set forth in the attached Cash Collateral Reply, the following is a summary of the key arguments detailed therein (but all arguments in the Cash Collateral Reply are incorporated herein by reference).

53.      The transactions under the United First Agreement were not true sales but disguised financing transactions (a/k/a/ loans).  The dispositive question courts consider in distinguishing collateralized loan agreements from true sales or assignment of accounts receivable is who bears the risk of nonpayment.  Here, the agreement between United First and the Debtors required the corporate owners, directors, and officers of the Debtors to provide personal guarantees of the Debtors' performance to United First, "or otherwise be held liable in full."  *See* D.I. 103 ¶ 41; *see also* D.I. 52-1 ¶ 17; D.I. 94-1 ¶ 3.2; Adv. D.I. 26-3 ¶ 3.2.  Moreover, contrary to the notion of United First owning (and having the obligation to collect) receivables, the Debtors were required to "collect the receipts themselves from their payment processors and remit funds from their own bank account to the MCA Lenders in the static daily amounts specified by each MCA Agreement, rather than remit the true specified percentage of each day's revenues listed in the MCA Agreements."  *Id*. ¶ 41.  Furthermore, "rather than identifying specific accounts receivable, or restricting the debtor's ability to process, collect, or commingle the identifiable receipts," the agreement between United First and the Debtors identifies nebulous percentages of receivables purchased and requires the Debtors to collect the receipts from their payment processors, commingle those funds in their own bank account, and then subsequently remit funds" to United First, putting the onus entirely on the Debtors"  *(id*. ¶ 43).

54.      Furthermore, rather than shifting the risk of non-payment of accounts to the Debtors, as would be expected if United First owned the accounts, "the United First Agreement notes that in the event of default, the specified daily percentage will immediately spike from 11% to 100% of the Debtors' daily revenues, and the full outstanding purchased amount will become "due and payable in full immediately." [D.I. 52-1 ¶ 14(a)]."  In short, not only did these agreements not identify receivables purchased (instead alleging a percentage of unspecified receivable

purchased, which clearly is insufficient to transfer the ownership of specific receivables), if account debtors were not paying, United First could call a default and seek payment *of all of the Debtors' revenues* – thus shifting the entire risk of non-collection onto the Debtors. Clearly, this was a lending relationship, not a factoring relationship.

55.     Because the agreement with United First was nothing more than a loan, United First was unsecured (because its rights were junior to those of Talent Art and Settle, who were undersecured) pursuant to the Final Cash Collateral Order.[5] Moreover, as a party with an alleged pre-petition security interest, United First held no interest in any post-petition receivables generated by the Debtors pursuant to section 552 of the Bankruptcy Code, so it cannot possibly assert that it holds a lien or security interest in any post-petition collateral or post-confirmation collateral of the Debtors.

56.     Consistent with the foregoing, the Debtors properly solicited United First's vote as a Holder of General Unsecured Claims by providing United First the appropriate ballot for voting its Class 2 General Unsecured Claims on July 30, 2024. *See* D.I. 126.[6] Per the Instructions for Completing the Ballots No. 10, "Ballots shall not be counted in determining the acceptance or rejection of the Plan: (e) any Ballot submitted by any Entity not entitled to vote pursuant to the Solicitation Procedures." *See* D.I. 123-3 at ¶ 10.

**B.     The Plan Is Fair and Equitable as to Unsecured Claims.**

---

[5] As explained in the Cash Collateral Reply, United First also did not properly perfect its security interest although this issue is moot because even if United First had a perfected security, it is junior to the unsecured Talent Art Liens, has no value, and United First is therefore unsecured.

[6]     Despite the fact that the Debtors only solicited United First's vote with respect to its Class 2 General Unsecured Claims, United First returned ballots both for Class 2 General Unsecured Claims and for Class 1 Secured Claims. The Debtors are not considering United First's Class 1 Ballot.

57.     Pursuant to Section 1191(b), to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.

58.     A class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class vote to accept the plan, counting only those claims whose holders actually vote. *See* 11 U.S.C. §§ 1126(c)–(d).

59.     If sections 1129(a)(8), (10), and (15) are not met, a plan of reorganization can nonetheless be confirmed on a non-consensual basis under section 1191(b), so long as the plan does not unfairly discriminate and is fair and equitable (as meant by section 1191(c)) as to classes of creditors and interests that did not accept the plan in accordance with section 1191 of the Bankruptcy Code.

60.     Section 1191(c) of the Bankruptcy Code sets forth the requirements for "fair and equitable" treatment under a non-consensual plan in a Subchapter V case:

> For purposes of this section, the condition that a plan be fair and equitable with respect to each class of claims or interests includes the following requirements:
>
> (1)     As of the effective date of the plan—
>
>> (A) the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or
>>
>> (B) the value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor.
>
> (2)
>> (A)(i) The debtor will be able to make all payments under the plan; or
>>
>> (B)(i) there is a reasonable likelihood that the debtor will be able to make all payments under the plan;

and

      (ii) the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.

11. U.S.C. § 1191(c).

61.      The Plan also satisfies the second requirement of Section 1191(c).  As evidenced in financial projections submitted with the Plan, the Debtors will apply all projected disposable income over the next five (5) years to make payments under the Plan, including to Holders of General Unsecured Claims starting in 2027.

62.      The Plan is fair and equitable and satisfies the third requirements of Section 1191(c) because as evidenced by the financial projections, there is a reasonable likelihood that the Debtors will be able to make all payments under the Plan for the next five years.

      **C.**      **The Third-Party Releases Are Consensual and Should Be Approved.**

63.      The UST Objection argues that "in contravention of governing Supreme Court precedent and state law, the Plan extracts non-consensual third-party releases from holders of claims or interests that vote to accept the Plan unless they also check an opt-out box on the Plan ballot." *See* D.I. 134 at 1.  For the reasons set forth below, the UST Objection should be overruled, as it rehashes arguments which have been rejected by this and other courts.  But for *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071 (2024), it is likely that this Court would overrule the UST Objection, given the favor with which this Court historically viewed opt-out and opt-in procedures, particularly where, as here, creditors who vote to accept the plan may affirmatively opt out of the third-party releases.  Put simply, this Court may rule on the third-party release issues presented as if *Purdue* did not exist because *Purdue* is abundantly clear that the law relating to (i) consensual releases and (ii) what constitutes consent, remain undisturbed.

64.     The Third-Party Releases should be approved because this Court has addressed the issue of opt outs both pre- and post-*Purdue* in *In re Gigamonster Networks, LLC*, No. 23-10051 (JKS), *In re Arsenal Intermediate Holdings, LLC, et. al.*, 2023 WL 2655592 (CTG) (Bankr. D. Del. March 27, 2023) and *In re Essar Steel Minn.*, 652 B.R. 709, 720 (Bankr. D. Del. 2023), and the opt-out mechanism, like the ones provided in the Class 1 and Class 2 Ballots, are sufficient to find it is a consensual release.

65.     The UST Objection does not explain how *Purdue* changed existing law concerning consensual releases, and indeed cannot explain how *Purdue* changed such existing law, because *Purdue* itself held that it has no effect on the current state of the law on consensual third-party releases.  The holding in *Purdue* is limited to the validity of nonconsensual third-party releases, and has no effect on the existing law regarding consensual third-party releases.

66.     No part of the *Purdue* decision disturbs the forgoing approach and interpretation of this Court.  In *Purdue*, the Supreme Court held that the Bankruptcy Code does not "authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants."  *Purdue Pharma*, 144 S. Ct. at 2088.  The Supreme Court went on to expressly, carefully note that its holding applied only to nonconsensual third-party releases like those suggested in favor of the Sackler family in the *Purdue* plan, cautioning that ""[a]s important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan ..." *Purdue Pharma*, 144 S. Ct. at 2088. (emphasis in original).  The Supreme Court further noted that it declined to "express a view on what qualifies as a consensual release …" *Id.*  Put simply, Purdue

does not impact the analysis this Court has historically relied upon in considering consensual third-party releases.

67.     Third-party release provisions containing opt-out mechanisms have been approved in this Court and others.  *See, e.g.*, *In re Cano Health, Inc.*, No. 24-10164 (KBO) (confirming a plan containing an opt-out box for parties voting to accept and holding that the third party releases "are consensual in nature because all Releasing Parties have either affirmatively consented to such releases or were given due and adequate notice thereof and sufficient opportunity and instruction to elect to opt out of such releases."); *In re Gigamonster Networks, LLC*, No. 23-10051 (JKS) (Bankr. D. Del. Aug. 30, 2024) (post-*Purdue* ruling confirming a plan containing third-party releases with an opt-out provision); *In re Bowflex Inc.*, Case No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024) (post-*Purdue* ruling confirming a plan containing third-party releases with an opt-out provision where the applicable ballot and notice "was reasonably calculated to ensure that each Holder of Claims and Interest in each Class was informed of its ability to opt-out of the Third-Party Releases and the consequences for doing so"); *In re Robertshaw US Holding Corp.*, No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) (holding that "[t]here is nothing improper with an opt-out feature for consensual third-party releases in a Chapter 11 plan); *In re Invitae Corporation*, Case No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) (confirming a Plan containing third-party releases with an opt-out provision holding that the opt-out procedures are "good, sufficient and adequate to bind the applicable parties to the Third-Party Release and are approved in all aspects."); *In re Appgate Inc.*, No. 1:24-10956 (CTG) (Bankr. D. Del. July 15, 2024) (suggesting that an opt-out box is a "helpful mechanic"); *Arsenal*, 2023 WL 2655592, at *3 (holding that opt-out forms were sufficient for purposes of approving consensual releases); *In re Essar Steel Minn.*,

652 B.R. 709, 720 (Bankr. D. Del. 2023) ("Giving creditors the ability to 'opt out' … rather than requiring them to file plan objections, is a good and sensible practice.").[7]

68.     More specifically, this Court in *Arsenal* concluded, generally, "conspicuous disclosure coupled by a simple means of opting out" was sufficient to protect the interests of creditors that opposed a third-party release.  2023 WL 2655592 at *8.  While the United States Trustee cites *Indianapolis Downs*, *see* UST Plan Obj. ¶ 31 n.3, it ignores this Court's rulings in *Gigamonster*, *Cano*, *Arsenal* and suggestions in *Essar* which would certainly be instructive in this Bankruptcy Case and remain undisturbed by *Purdue*.

69.     Notably, the releases approved in *Robertshaw*, *Invitae*, and *Bowflex* all deemed creditors who voted to accept the applicable plan to have consented to the third party releases with no ability to opt out.  In each of those cases, only parties who voted to reject or who abstained from voting or were deemed to reject were able to opt out of the third party releases.  In stark contrast, the Debtors' ballots here are distinguishable and provide even more protection to the voting class:  even if a Holder affirmatively voted to accept, such Holder still had the ability to opt-out.  And to be entirely clear, notwithstanding the statements in the UST Objection to the contrary, **only Holders that have the ability to vote are subject to the release provisions**.

70.     Here, as in *Cano*, the ballots provided a plain and conspicuous opportunity to opt out to all voting Holders.  There is no questioning the consensual nature of the releases.  Claim Holders in the voting class had notice and opportunity to opt out by checking the appropriate box on the ballot or objecting on or before the confirmation objection deadline.  The Debtors explicitly included the full text of the release provision in the ballots, which expressly alerted parties of the

---

[7]    Creditors who voted to accept the plans in *Robertshaw* and *Invitae* were deemed to consent to releases and were not entitled to opt out.  Here, even those creditors who vote to accept the plan are entitled to opt out of the Third Party Releases.

deadlines to vote and object on the Plan, and that unless a party opts out or objects to the Plan, it shall be deemed to release the Released Parties under the Plan.  Precedent dictates that a claim holder's failure to exercise their opt out rights pursuant to a conspicuous, appropriate opt out mechanism constitutes consent, and this Court should not rule any differently.  Those creditors who wished to opt out of the release provisions did so, as evidenced by Settle, which voted to accept and also chose to opt-out of the releases.

71.     The UST Objection contends that the Debtors' Third-Party Releases "appear to be aimed at extinguishing Messrs. Ambrose and Gobel's [sic] personal guarantees of the Debtors' merchant cash advance funding agreements." *See* D.I. 134 at 5.  However, the Court need not look further than the ballots filed by United First and Velocity to determine that this is not the case. Both United First and Velocity elected to reject the Plan in Class 2, but chose to not to check the opt-in box to grant the Third-Party Releases.

72.     Moreover, the Third-Party Releases are integral provisions of the Plan and help provide finality for the Released Parties, in exchange for good and valuable consideration provided by the Released Parties.  The Debtors' Releases are in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests and are fair, equitable, and reasonable.  Further, each Creditor was given due notice and was given an opportunity to be heard as it relates to the Third-Party Releases as evidenced by the *Certificate of Service* of the Solicitation Materials [D.I. 126].  For the foregoing reasons, the Third-Party Releases are permissible.

73.     Additionally, Section 1141(a) of the Bankruptcy Code binds holders of claims and interests to a plan's provisions—including third-party releases contained therein—if such party in interest receives proper notice but fails to object to confirmation of the plan.  Section 1141(a) describes the effect of confirmation of a Chapter 11 plan; it states that the provisions of a confirmed

plan bind the debtor, any entity issuing securities or acquiring property under the plan, and any creditor of, or equity security holder in, the debtor. *See* 11 U.S.C. § 1141(a) (providing that a confirmed plan binds, among others, "any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan . . . ."). A Chapter 11 plan binds parties even if they are not scheduled, have not filed a claim, are not receiving a distribution, or retaining any interest under the plan. *See, e.g.*, *In re Platinum Oil Props., LLC*, 465 B.R. 621, 638 (Bankr. D.N.M. 2011) ("A confirmed Chapter 11 plan is binding on all parties described in 11 U.S.C. § 1141(a) who received proper notice . . . . In fact, confirmation binds creditors and other parties in interest even if those parties have not accepted the plan . . . 'even if it had a different understanding of [the plan's terms] or did not realize their effect.'") (quoting *In re K.D. Co., Inc*., 254 B.R. 480, 491 (B.A.P. 10th Cir. 2000).

74.     A confirmation order also operates as a final judgment. *Silverman v. Tracar, S.A. (In re Am. Preferred Prescription, Inc.)*, 255 F.3d 87, 92 (2d Cir. 2001). A confirmation order "is a judgment in rem—a determination of the debtor's status as a Chapter 11 debtor and is binding upon all parties in interest, whether or not they have appeared to contest entry of the order." 8 Collier on Bankruptcy ¶ 1141.02[4] (16th ed. 2019). Consequently, the confirmation order serves as *res judicata* as to any issues that were or could have been raised at the confirmation hearing. *See Iberiabank v. Geisen (In re FFS Data, Inc.)*, 776 F.3d 1299, 1306 (11th Cir. 2015). For these reasons, a party must file an objection if it disagrees with its treatment under a plan, including if it does not want to release any third party. *See* Confirmation Hr'g Tr. 62:10–14, *In re Gibson Brands*, No. 18-11025 (CSS) (Bankr. D. Del. Oct. 2018) ("I have ruled numerous times that 'check the box' isn't required for a creditor to be deemed – to have been deemed to consent to something, that it's sufficient to say, here's your notice, this is what's going to happen and if

you don't object, you'll have been deemed to consent."); *Arsenal*, 2023 WL 2655592 at *5–7 (Bankr. D. Del. Mar. 27, 2023) (suggesting that if a party-in-interest does not opt out of the third-party releases nor objections to the plan after prominent and conspicuous disclosure, the release provisions can be deemed consensual or technically forfeited).

75.     Only those claim holders that received notice of Confirmation that affirmatively voted to accept the Plan and chose not to opt out of the release provision are bound by the Third-Party Releases.   Accordingly, the Debtors respectfully urge this Court to overrule the UST Objection in accordance with settled caselaw, and should find, as in *Cano*, *Gigamonster*, *Arsenal*, and *Essar* that the Third-Party Release provisions are appropriate and confirm the Debtors' Plan.

**D.     The Plan Is Feasible.**

76.     The United First Objection raises non-specific concerns regarding the Plan's feasibility (merely stating that "there may be feasibility and other issues that prevent confirmation.) *See* D.I. 137 at ¶ 18.  While United First does not provide any legal or evidentiary support for its concerns beyond this conclusory statement, the Debtors are nevertheless prepared to submit a fulsome evidentiary record at the Confirmation Hearing establishing feasibility by a preponderance of the evidence.

77.     Section 1129(a)(11) of the Bankruptcy Code, which requires a court to find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  A plan proponent must prove a Chapter 11 plan's feasibility by the preponderance of evidence*. See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (rejecting "clear and convincing" as the applicable standard).  The threshold of proof necessary to satisfy the requirement is relatively low.  *See In re Sea Garden Motel and*

*Apartments*, 195 B.R. 294, 304 (Bankr. D. N.J. 1996). To demonstrate that a plan is feasible, it is not necessary that success be guaranteed. *See In re Landing Assoc., Ltd*., 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993) (noting that no plan can offer absolute certainty and that Section 1129(a)(9) requires only that the plan offer a reasonable probability of success). Rather, a bankruptcy court must determine whether a plan is workable and has a reasonable likelihood of success. *See U.S. v. Energy Res. Co*., 495 U.S. 545, 549 (1990); *IRS v. Kaplan (In re Kaplan)*, 104 F.3d 589, 597 (3d Cir. 1997).

78.     Here, the Plan includes a five-year financial projection attached thereto as Exhibit B, which demonstrates the Debtors' ability to make all of the payments due on the Effective Date, the First Distribution Date, and thereafter. *See* D.I. 138. The Plan will be funded with funds that are not for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtors. The Debtors' financial projections show that the Debtors will have a cash flow after paying operating expenses and post-confirmation taxes to meet its obligations under the Plan. All Disposable Income will be devoted to satisfying Allowed Claims under the Plan. *See* D.I. 138 at Ex. B.

79.     As reflected in the Financial Projections, the Debtors are more than capable of satisfying Allowed Claims in the five-year period as described in the Plan and in accordance with all applicable Bankruptcy Code requirements. *Id*.

80.     The Debtors will have sufficient cash on hand on the Effective Date to pay all of the Claims and expenses that are entitled to be paid on that date. Moreover, General Unsecured Claims will be paid pro rata in quarterly installments from Disposable Income commencing in 2027 and ending on the Last Distribution Date. *Id*. Therefore, Confirmation of the Plan is not

likely to be followed by the need for further financial reorganization of the Debtors, thereby satisfying (or eliminating the need to consider) Section 1129(a)(11) of the Bankruptcy Code.

## II.   **The Plan Satisfies the Disclosure Requirements of 11 U.S.C. § 1190.**

81.   Pursuant to Section 1190 of the Bankruptcy Code, a plan filed under Subchapter V:

1)  shall include –

A.  a brief history of the business operations of the debtors;

B.  a liquidation analysis; and

C.  projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization;

2)  shall provide for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan.

11 U.S.C. § 1190(1)–(2).

82.   Article 1 of the Plan provides a detailed "History of the Business Operations of the Debtors," including subsections entitled "Nature and History of the Debtors' Business," "Filing of the Debtors' Chapter 11 Cases," "Legal Structure and Ownership," "Debtors' Assets," "Debtors' Financial Condition," "Events Leading to Filing the Chapter 11 Cases," "Significant Events During the Chapter 11 Cases," and "Projected Recovery of Avoidable Transfers."  These Sections describe key events which have transpired before and during the bankruptcy cases, and satisfy Section 1190(1)(A) of the Bankruptcy Code.  Further, a Liquidation Analysis, showing that Creditors and Equity Interest Holders will receive at least as much under the Plan as such Holders would receive in a liquidation under Chapter 7 of the Bankruptcy Code, was attached as Exhibit C to the Plan, thereby satisfying Section 1190(1)(B) of the Bankruptcy Code.  Finally, the Debtors attached financial projections, as Exhibit B thereto, evidencing their ability to make payments

under the Plan, and satisfying Section 1190(1)(C) of the Bankruptcy Code. Accordingly, the Plan satisfies Section 1190 and should be confirmed.

### III. The Plan Satisfies the Confirmation Requirements of a Non-Consensual Plan Under 11 U.S.C. § 1191(b).

83. A Subchapter V plan can be confirmed consensually under Section 1191(a) of the Bankruptcy Code if all requirements of Section 1129(a) other than Subsection 1129(a)(15) are met. 11 U.S.C. § 1191(a). If a consensual plan is confirmed under Section 1191(a), the Subchapter V Trustee's service is terminated upon "substantial consummation." 11 U.S.C. § 1183(c). Also, if a consensual plan is confirmed under Section 1191(a), the debtor receives its discharge on the effective date of the plan under Section 1141(d). *See also* 11 U.S.C. §§ 1181(c),1192.

84. Alternatively, if Sections 1129(a)(8), (10), and (15) are not met, a plan can be confirmed on a non-consensual basis under Section 1191(b), so long as the plan does not unfairly discriminate as to classes of creditors and interest that did not accept the plan.

85. Here, the Plan is non-consensual. As more particularly described in the Voting Declaration, of the classes entitled to vote on the Plan, Holders of Class 2 General Unsecured Claims have voted to reject the Plan; accordingly, Sections 1129(a)(8) and 1129(a)(10) are not satisfied. Nevertheless, as set forth below, the Plan is confirmable under Section 1191(b) as it meets all other applicable requirements of Section 1129(a) and is "fair and equitable" as that term is defined in Section 1191(c) of the Bankruptcy Code.

### IV. The Plan Satisfies the Applicable Provisions of 11 U.S.C. § 1129(a).

#### A. The Plan Complies with Section 1129(a)(1).

86. Section 1129(a)(1) of the Bankruptcy Code requires that a plan "complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of 11 U.S.C. § 1129(a)(1) explains that this provision encompasses the requirements of 11 U.S.C.

§§ 1122 and 1123 governing classification of claims and contents of a plan, respectively. H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986); *In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

### B.     The Plan Complies with the Requirements of Section 1122.

87.     Section 1122 provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to other claims or interests of such class."  11 U.S.C. § 1122(a).  Courts have recognized that plan proponents have significant flexibility under Section 1122 in classifying claims.  *See Frito-Lays Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (affirming separate classification where rational basis existed for classification scheme).   Indeed, as one court noted, "even in the context of reorganization, a majority of both cases and commentators have rejected the concept that all creditors of equal rank must receive equal treatment."  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989).  Such that courts will generally approve placement of similar claims in different classes, provided there is a rational or reasonable basis to do so.  *See also In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar.") (citation omitted); *see also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987) ("The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes.").

88.     Here, the Plan contains three (3) separate classes of claims and interests, with each class containing substantially similar claims or interests as required by Section 1122:  Secured Claims (Class 1), General Unsecured Claims (Class 2), and Equity Interests (Class 3).  Each of the three classes are dissimilar and, therefore, are properly classified separately under the Plan.  Based on the foregoing, the Debtors submit the Plan complies with the provisions of Section 1122 and should be confirmed.

### C.     The Plan Satisfies the Mandatory Requirements of Section 1123(a).

#### i.     Section 1123(a)(1)

89.     Section 1123(a)(1) requires a plan designate classes for all claims and interests, other than the types of claims specified in Section 507(a)(2) (administrative expense claims), Section 507(a)(3) (claims arising during the "gap" period in an involuntary bankruptcy case) and 507(a)(8) (priority tax claims).  11 U.S.C. § 1123(a)(1).  The Plan expressly classifies all claims and interests against the Debtors, other than Administrative Claims and Priority Tax Claims, which are unclassified under the Plan.

#### ii.     Section 1123(a)(2)

90.     Section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).  Article 2 of the Plan identifies Equity Interests (Class 3) as unimpaired.  This requirement is satisfied.

#### iii.     Section 1123(a)(3)

91.     Section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."  11 U.S.C. § 1123(a)(3).  Article 2 of the Plan details the treatment of Secured Claims (Class 1) and General Unsecured Claims (Class 2) as impaired classes under the Plan.  This requirement is satisfied.

iv.     Section 1123(a)(4)

92.     Section 1123(a)(4) requires that a plan provide that each claim or interest in a particular class receive the same treatment as other members of the same class.  11 U.S.C. § 1123(a)(4).  Article 2 of the Plan satisfies this requirement by providing that each claim or interest that is classified in a particular Class under the Plan will receive the same treatment as the other claims and interests included in such Class.

v.     Section 1123(a)(5)

93.     Section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and sets forth examples of typical means for implementing a plan.  11 U.S.C. § 1123(a)(5).  The Plan provides that it will be funded by the proceeds realized from the operations of the Debtors, as well as litigation recoveries from the Adversary Proceeding, if any.  On Confirmation of the Plan, all property of the Debtors, both tangible and intangible, will revert to the Debtors, free and clear of all Claims and Equity Interests except as provided in the Plan.  Further, the Plan specifies that Jack Ambrose and Andrew Goble, the current co-CEOs of the Debtors, shall remain with the Reorganized Debtors after the Effective Date, pursuant to Article 2.7 of the Plan.  Based on the foregoing, the Debtors submit that the Plan complies with the requirements of Section 1123(a)(5) of the Bankruptcy Code.

vi.     Section 1123(a)(6)

94.     Section 1123(a)(6) of the Bankruptcy Code prohibits the issuance of non-voting equity securities and requires that reorganized debtors' charters so provide.  The Plan does not provide for issuance of non-voting equity securities and so this Section of the Bankruptcy Code is inapplicable.

vii.     Section 1123(a)(7)

95.     Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).  Here, Holders of Equity Interests will maintain their existing Equity Interests as they existed on the Petition Date and applicable non-bankruptcy law.  Further, as stated above, the Plan specifies that Jack Ambrose and Andrew Goble, the current co-CEOs of the Debtors, shall remain with the Reorganized Debtors after the Effective Date, pursuant to Article 2.7 of the Plan.  As such, the Plan complies with this Section.

viii.     Section 1123(a)(8)

96.     Section 1123(a)(8) requires that, in a case in which the debtor is an individual, the plan provides for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan. 11 U.S.C. § 1123(a)(8).  This Section of the Bankruptcy Code is inapplicable because the Debtors are corporations.

**D.     The Consensual Release Provisions and the Exculpation Provision Under the Plan Are Consistent with Section 1123(b).**

97.     The Plan provides for the releases of certain claims by the Debtors and the Reorganized Debtors (the "Debtors' Releases"), as well as consensual releases for the Debtors' pre- and post-petition professionals (the "Third-Party Releases," and together with the Debtors' Releases, the "Release Provisions").  Furthermore, the Plan exculpates estate fiduciaries that are critical to the Chapter 11 Case (the "Exculpation Provision").  The Release Provisions and Exculpation Provision are integral components of the Plan, are consistent with the Bankruptcy Code, and comply with applicable case law and recent precedent, and, as such, should be approved.

i. The Debtors' Releases Are Appropriate and Should be Approved

98. Section 1123(b)(3)(A) of the Bankruptcy Code provides that a Chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or the estate." *See* 11 U.S.C. § 1123(b)(3)(A); *see also In re Coram Healthcare Corp*., 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that the standard for approval of a settlement under Section 1123 of the Bankruptcy Code is generally the same as under Bankruptcy Rule 9019).  Courts in the Third Circuit typically approve a settlement by a debtor if the settlement "exceed[s] the lowest point in the range of reasonableness." *See e.g In re Coram Healthcare*, 315 B.R. at 330 (citations omitted); *In re Exaeris, Inc*., 380 B.R. 741, 746-47 (Bankr. D. Del. 2008) (citations omitted); *In re World Health Alts., Inc*., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that the settlement must be "within the reasonable range of litigation possibilities") (internal quotation marks omitted).  Furthermore, a debtor may release claims under Section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc*., 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citing Section 1123(b)(3)(A) of the Bankruptcy Code) (internal quotation marks omitted).

99. Article 6 of the Plan provides for a customary release of any and all Causes of Action, including derivative claims, of the Released Parties[8], each Holder of a Claim or Equity Interest entitled to vote to accept or reject the Plan that votes to accept the Plan, each Holder of a Claim or Equity Interest that is unimpaired and presumes to accept the Plan, and parties related to

---

[8] "**Released Party**" means each of the following: (a) the Debtors; (b) Jack Ambrose; (c) Andrew Goble; (d) the Debtors' prepetition attorneys and professionals; (d) the Debtors' Professionals; and (e) the Representatives of (a) through (d) hereof.

each of the foregoing in connection with, among others, the Debtors, the restructuring efforts and documents, the Chapter 11 Case and the Plan.

100.     The Debtors' Releases are a valid exercise of the Debtors' business judgment, and are fair, reasonable, and in the best interests of the Debtors' Estate.  The Released Parties made valuable contributions to the restructuring process and efforts to negotiate and implement the Plan. Among other things, the Released Parties participated in negotiations with the Debtors in connection with the development of the Plan that ultimately resulted in a confirmable Plan and are integral for implementation of the Plan.

101.     The Debtors' Releases are essential to the Plan because they constitute an integral part of the restructuring.  As described above, each of the Released Parties made contributions to the Chapter 11 Case or will do so as a means to implement the Plan and did or will do so with the understanding that they would receive releases from the Debtors.  Without the Released Parties' support, the Debtors would not be in a position to confirm the Plan.

102.     Accordingly, the Debtors' Releases are fair and equitable and in the best interests of the Debtors' Estate and should be approved.

      ii.      <u>The Releases by Holders of Claims and Equity Interests Are Appropriate and Should be Approved</u>.

103.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a Chapter 11 plan.  Among other things, Section 1123(b) of the Bankruptcy Code provides that a party may "include any other appropriate provision not inconsistent with the applicable provisions of" the Bankruptcy Code. 11 U.S.C. § 1123(b)(1)-(4), (6).

104.     In addition to the Debtors' Releases, Article 6.10 of the Plan provides for certain Third-Party Releases.  As described above, the Third-Party Releases are (i) consistent with Third

Circuit Precedent and do not run afoul of the United States Supreme Court's decision in *Purdue*, and (ii) integral to the Plan, and should be approved.

      iii.      <u>The Exculpation Provision Should Be Approved</u>

    105.   In addition to the releases, Article 6 of the Plan provides for the Exculpation Provision. The Exculpation Provision is intended to prevent collateral attacks against estate fiduciaries that have acted in good faith to help facilitate the Debtors' restructuring. Moreover, the Exculpation Provision is an integral part of the Plan and otherwise satisfies governing standards in the Third Circuit as it provides necessary and customary protections to estate fiduciaries whose efforts were, and continue to be, vital to implementing the Plan. Accordingly, the Exculpation Provision should be approved.

    106.   An exculpation provision is not a mandatory release of all liability, but instead, establishes the appropriate standard of liability with respect to the parties exculpated. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (reasoning that the exculpation provision "does not affect the liability of third parties, but rather sets forth the appropriate standard of liability"); *see also In re Enron Corp.*, 326 B.R. 497, 501 (S.D.N.Y. 2005) (in finding creditors' appeal of confirmation based on the plan's exculpation provision moot, the court specifically noted that the bankruptcy court addressed the exculpation provision and found it appropriate because it excluded gross negligence and willful misconduct). In order to confirm a plan of reorganization, this Court must find, under Section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code. Additionally, the Court must find, under Section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law. These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees and professionals. Further, these findings evidence that the Plan was negotiated at arm's length and in good faith. Insofar as the Debtors negotiated the myriad issues during the course of these Chapter

11 Cases, as well as the terms of the Plan, with the other Exculpated Parties, the Courts' good faith findings with respect to the Debtors' Chapter 11 Cases should extend to them.

107.    In the Third Circuit, exculpation provisions like the one set forth in the Plan are regularly approved. *See In re Laboratory Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the Chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan Sponsor was appropriate under Section 1123(b)).  Exculpation provisions that are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances. *See In re Wash. Mut., Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011) (holding that an exculpation clause that encompassed "the fiduciaries who have served during the Chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

108.    Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se* but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtor's restructuring. *See PWS Holding Corp.*, 228 F.3d at 245 (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code."); *see also In re Premier Int'l Holdings, Inc.*, No. 09–12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, No. 09–10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. April 16, 2010) (same).

109.     Further, it is well established that exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.  *See In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) ("I believe that an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.");  *In re Drexel Burnham Lambert Group, Inc*., 960 F.2d 285, 293 (2d Cir. 1992); *Enron Corp*., 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

110.     Further, to confirm a plan, this Court must find, under Section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, the Court must find, under Section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings evidence that the Plan was negotiated at arm's length and in good faith.  Insofar as the Debtors negotiated the myriad issues during the course of these Bankruptcy Cases, as well as the terms of the Plan, with the other Exculpated Parties, the Court's good faith findings with respect to the Debtors' Bankruptcy Cases should extend to them.

111.     Article 6.12 of the Plan exculpates parties with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Debtors' Chapter 11 Cases.  The Exculpated Parties were critical to the Chapter 11 Cases, and specifically, the formulation of the Plan.  The Debtors ask that the Court find that the Exculpated Parties participated in good faith with respect to these Chapter 11 Cases

for the same reasons discussed in Section III.C. *infra*. Negotiation and compromise were crucial to the conduct of the Chapter 11 Cases generally and the formulation of a feasible Plan and could not have occurred without the protection from liability that the Exculpation Provision provides to the Exculpated Parties.

112.     The Exculpation Provision, which is limited to estate fiduciaries and includes the carve out for gross negligence and willful misconduct, is consistent with established practice in this jurisdiction and others and should be approved. *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 235, 245 (3d Cir. 2000) (approving plan provision that released claims except as to willful misconduct or gross negligence, and characterizing such a provision as "commonplace . . . in Chapter 11 plans"); *In re Wash Mut. Inc.*, 442 B.R. at 350 (noting that the "Third Circuit has held that a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence"). Accordingly, the Exculpation Provision does not amount to a stark departure from other Chapter 11 plans confirmed in this district. *See, e.g.*, *In re VER Technologies HoldCo, LLC*, No. 18-10834 (KG) (Bankr. D. Del. July 26, 2018); *In re Sea Containers Ltd.*, No. 06-11156 (KJC) (Bankr. D. Del. Nov. 24, 2008); *In re ACG Holdings*, No. 08-11467 (CSS) (Bankr. D. Del. Aug. 6, 2008*); see also In re DJK Residential LLC*, No. 08-10375, (Bankr. S.D.N.Y. May 7, 2008) (approving an exculpation provision that excluded gross negligence and willful misconduct without unresolved objections); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (Bankr. S.D.N.Y Sept. 7, 2007).

113.     Therefore, the Court should approve the Exculpation Provision and adopt the appropriate standard of liability for the Exculpated Parties with respect to Exculpated Claims.

### E.     The Plan Complies with Section 1129(a)(2).

114.     Section 1129(a)(2) of the Bankruptcy Code requires that the plan "compl[y] with the applicable provisions" of the Bankruptcy Code, which generally is intended to ensure that a

plan proponent has complied with the requirements of the Bankruptcy Code governing the solicitation of acceptances of a plan.  *See In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988).

115.    In accordance with the Solicitation Order, the Debtors, via their counsel, have tabulated the ballots submitted by creditors and timely filed their Voting Declaration.  The Debtors, therefore, submit that Section 1129(a)(2) of the Bankruptcy Code has been satisfied.

**F.      The Plan Complies with Section 1129(a)(3).**

116.    Section 1129(a)(3) requires that a Chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code" in light of the particular facts and circumstances of the case.  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004); *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (quoting *In re Madison Hotel Associates*, 749 F.2d 410, 424-25 (7th Cir. 1984)); *In re Burns & Roe Enters.*, No. 08-4191 (GEB), 2009 U.S. Dist. LEXIS 13574, at *78 (D.N.J. Feb. 20, 2009).

117.    The Debtors' good faith in proposing the Plan is more than evident.  Although not defined by the Bankruptcy Code, "good faith" has been described to include (i) a showing the plan was proposed with honesty and good intentions, and (ii) the existence of a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.  *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *see also*, *Traders State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.)*, 917 F.2d 1210, 1214 (9th Cir. 1989) (interpreting analogous provision under Chapter 12); *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D. Cal. 1982).  Moreover, "[w]here the plan is proposed with the legitimate and honest purpose

to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a Chapter 11 plan. *Id*.

118.    The Plan is the product of arms-length negotiation with Holders of Secured Claims, Holders of General Unsecured Claims, the Subchapter V Trustee, and Holders of Equity Interests. This groundwork resulted in a notable number of votes to accept the Plan notwithstanding the three (out of 8) votes that tipped the scales towards a rejecting class. Thus, there is substantial support for a finding that the Plan has been proposed in good faith and not by any means forbidden by law. Therefore, the Plan complies with Section 1129(a)(3) of the Bankruptcy Code and should be confirmed.

### G.    The Plan Complies with Section 1129(a)(4).

119.    Section 1129(a)(4) requires that payments "for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case," be approved by the Court as reasonable. 11 U.S.C. § 1129(a)(4). In other words, Section 1129(a)(4) requires that the Court review and approve any payments on account of non-ordinary course administrative expenses. *See, e.g.*, *In re Resort Int'l, Inc.*, 145 B.R. 412, 475–76 (Bankr. D.N.J. 1990); *In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (Bankruptcy Code Section 1129(a)(4) satisfied where plan provides for payment of "allowed" administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988). Under the Plan, each estate Professional must file and serve a properly noticed fee application, and pursuant to the Bankruptcy Code, only the amount of fees allowed by the Court will be paid. Accordingly, this Section of the Bankruptcy Code is satisfied.

**H.      The Plan Complies with Section 1129(a)(5).**

120.     Section 1129(a)(5) requires that (i) the plan proponent disclose the identity of any individual that will serve after confirmation of the plan as a director, officer, or voting trustee of the debtor or that will be a successor to the debtors under the Plan and that the appointment of any such individual be consistent with the interests of creditors and shareholders and public policy and (ii) the plan proponent disclose the identity of any insider that will be employed by the reorganized debtor and the nature of the compensation that they will receive.  11 U.S.C. §§ 1129(a)(5)(A), (B). This Section is satisfied as Jack Ambrose and Andrew Goble, the current co-CEOs of the Debtors, shall remain with the Reorganized Debtors after the Effective Date, pursuant to Article 2.7 of the Plan.

121.     Therefore, Section 1129(a)(5) of the Bankruptcy Code is satisfied.

**I.      Section 1129(a)(6) Is Inapplicable.**

122.     Section 1129(a)(6) requires that any regulatory commission with jurisdiction over the rates of a debtor approve any changes in rate regulations provided in a plan.  11 U.S.C. § 1129(a)(6).  The Debtors are not subject to any such regulation and the Plan does not propose any such rate changes, thus this Section is inapplicable.

**J.      The Plan Complies with Section 1129(a)(7).**

123.     Section 1129(a)(7) requires that, with respect to each class of impaired claims or interests under a plan, every holder of a claim or interest in such impaired class either (i) accept the plan, or (ii) receive or retain property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.  11 U.S.C. § 1129(a)(7).  This is often referred to as the "best interests test."  Under the best interests test, the court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were

liquidated [under Chapter 7 of the Bankruptcy Code]." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 440 (1999); *United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213, 228 (1996). The best interests test focuses on individual dissenting creditors rather than classes of claims. *See 203 N. LaSalle St. P'ship*, 526 U.S. at 440.

124.    Here, as described in the Plan, the Debtors have put forth affirmative evidence showing that general unsecured creditors will fare better under the Plan than in a Chapter 7 liquidation. The Liquidation Analysis demonstrates that Holders of Claims are projected to receive at least as much under the Plan as they would expect to receive in a hypothetical Chapter 7 liquidation. The Debtors have also filed concurrently herewith, the Confirmation Declaration, which reaffirms both the liquidation and disposable income analysis in the Plan. Accordingly, the Plan satisfies the best interest of creditors test.

**K.    The Requirements of Section 1129(a)(8) are Inapplicable Because the Debtors Are Seeking Confirmation Pursuant to Section 1191(b) of the Bankruptcy Code.**

125.    Section 1129(a)(8) requires that each class of claims and interests established under a plan either accept the plan or not be impaired under the plan. 11 U.S.C. § 1129(a)(8). A class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class vote to accept the plan, counting only those claims whose holders actually vote. *See* 11 U.S.C. §§ 1126(c)–(d). As set forth above, the Plan does not satisfy this requirement. However, because the Debtors are seeking confirmation pursuant to Section 1191(b) of the Bankruptcy Code, Section 1129(a)(8) is not applicable. *See* 11 U.S.C. § 1191(b) ("[I]f all of the applicable requirements of Section 1129(a) of this title, *other than paragraphs (8), (10)* and (15) of that Section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan *notwithstanding the requirements of such paragraphs . . . .*") (emphasis added). As set

forth more fully below, the Debtors submit that the Plan satisfies the standard for non-consensual confirmation under Section 1191(b) of the Bankruptcy Code.

126.    Here, Holders of Secured Claims (Class 1) and General Unsecured Claims (Class 2) are impaired and entitled to vote on the Plan.  As detailed in the Voting Declaration, Class 2 have voted to reject the Plan.  However, it is noteworthy that five (5) ballots in Class 2 voted to accept the Plan while only three (3) ballots voted to reject the Plan. Based on the foregoing, Section 1129(a)(8) is inapplicable.

**L.    The Plan Complies with Section 1129(a)(9).**

127.    Bankruptcy Code Section 1129(a)(9) provides that, unless the holder of a claim agrees to a different treatment of its claim:

a.  the holder of a claim entitled to priority under section 507(a)(2) or (3) must receive cash equal to the allowed amount of its claim on the effective date of the plan;

b.  the holder of a claim entitled to priority under section 507(a)(1), (4), (5), (6), or (7) must receive either cash in the allowed amount of such claim on the effective date of the plan or deferred cash payments of a value, as of the effective date, equal to the allowed amounts of such claim; and

c.  the holder of a tax claim entitled to priority under section 507(a)(8) must receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of a plan, equal to the allowed amount of such claim.

11 U.S.C. § 1129(a)(9).

128.    The Plan and its proposed treatment of Administrative Expense Claims and Priority Tax Claims satisfy the requirements of Section 1129(a)(9).  With respect to Administrative Expense Claims, the Plan provides that all allowed administrative fees and expenses will be paid in full after the Effective Date as soon as funds are available or as soon as practicable thereafter, unless the holder agrees or shall have agreed to other treatment of such claim.

129.     Holders of Administrative Expense Claims incurred post-petition in the ordinary course of Debtors' business shall be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court and that cure amounts related to leases and/or executory contracts that are assumed shall be paid in full in connection with such assumption as set forth in the Plan.

130.     Additionally, Section 1129(a)(9)(C) provides that claims specified under Section 507(a)(8) may be paid in regular installments (i) of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such claim, (ii) over a period ending not later than 5 years after the date of the order for relief, and (iii) in a manner not less favorable that the most favored nonpriority unsecured claim provided for by the Plan.   11 U.S.C. § 1129(a)(9)(C). The Plan, including provisions under Article 2.1, provides for payment of Priority Tax Claims in quarterly installments commencing in Q4 2024 and completing in or around Q3 2029 or otherwise. Accordingly, the Plan can be confirmed.

> **M.     The Requirements of Section 1129(a)(10) Are Inapplicable Because the Debtors are Seeking Confirmation Pursuant to Section 1191(b) of the Bankruptcy Code.**

131.     Section 1129(a)(10) requires that at least one class of claims that is impaired under the plan has voted to accept the plan, determined without including any acceptance of the plan by any insider. 11 U.S.C. § 1129(a)(10).  As set forth in the Voting Declaration, Class 1 voted to accept the Plan and Class 2 voted to reject the Plan.  However, because the Debtors are seeking confirmation pursuant to Section 1191(b) of the Bankruptcy Code, Section 1129(a)(10) is not applicable.  *See* 11 U.S.C. § 1191(b) ("[I]f all of the applicable requirements of Section 1129(a) of this title, *other than paragraphs (8), (10)* and (15) of that Section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan *notwithstanding the requirements of such paragraphs . . . .*") (emphasis added).  As set forth more fully below, the Debtors submit that the

Plan satisfies the standard for non-consensual confirmation under Section 1191(b) of the Bankruptcy Code.

### N.    The Plan Complies with Section 1129(a)(11).

132.    Section 1129(a)(11) requires a court to find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

133.    As discussed *supra* and reflected in the Debtors' financial projections attached to the Plan, the Debtors are more than capable of satisfying Allowed Claims in the five-year period. *See* D.I. 138 at Exh.B. Moreover, General Unsecured Claims will be paid *pro rata* in quarterly installments from Disposable Income commencing in 2027 and ending on the Last Distribution Date. *Id.* at Exh. B. The Debtors will have sufficient cash on hand on the Effective Date to pay all of the Claims and expenses that are entitled to be paid on that date, and will be able to satisfy Allowed General Unsecured Claims until the Last Distribution Date, with such payments currently expected to last for five years. Therefore, Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors, thereby satisfying (or eliminating the need to consider) Section 1129(a)(11) of the Bankruptcy Code.

### O.    Section 1129(a)(12) is Inapplicable.

134.    Section 1129(a)(12) of the Bankruptcy Code requires that a plan provide that all fees payable under 28 U.S.C. § 1930 be paid on or before the effective date of the plan. Here, the Debtors have elected to proceed under Subchapter V of Chapter 11 of the Bankruptcy Code where such fees are not due by the Debtors. Accordingly, this Section of the Bankruptcy Code is inapplicable.

**P.      Section 1129(a)(13) is Inapplicable.**

135.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue to be paid post confirmation at any levels established in accordance with Section 1114 of the Bankruptcy Code.  The Debtors do not have any present obligations to pay retiree benefits within the meaning of Section 1129(a)(13).  Accordingly, this Section of the Bankruptcy Code is inapplicable.

**Q.      Section 1129(a)(14) is Inapplicable.**

136.    Section 1129(a)(14) requires that, if applicable, the debtors pay all domestic support obligations.  Here, the Debtors are corporations and are not required by any judicial or administrative order to pay domestic support obligations.  As such, this Section of the Bankruptcy Code is inapplicable.

**R.      Section 1129(a)(15) is Inapplicable.**

137.    Pursuant to Section 1181(a), Section 1129(a)(15) of the Bankruptcy Code is inapplicable in Subchapter V cases.

**S.      Section 1129(a)(16) is Inapplicable.**

138.    Section 1129(a)(16) requires that transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  This Section is inapplicable as the Plan calls for no such transfers.

**T.      The Plan Meets All of the Confirmation Requirements Under Section 1191(b) and (c) of the Bankruptcy Code.**

139.    Pursuant to Section 1191(b), to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly" and

is "fair and equitable" with respect to the non-accepting impaired classes. In turn, Section 1191(c) provides how a plan is "fair and equitable."

140. Class 1 (Secured Claims) and Class 2 (General Unsecured Claims) are impaired under the Plan. Class 2 voted against the Plan. However, as demonstrated *supra*, the Plan does not unfairly discriminate and it is fair and equitable with respect to Class 2.

      i.      The Plan is Fair and Equitable Pursuant to Section 1191(c) of the Bankruptcy Code.

141. As explained in detail above, Section 1191(c) of the Bankruptcy Code sets forth the requirements for "fair and equitable" treatment under a non-consensual plan in a Subchapter V case.

142. The first requirement of Section 1191(c) addresses secured claims which are unimpaired under the Plan. Class 1 voted to accept the Plan, and therefore this section is not applicable.

143. The Plan satisfies the second requirement of Section 1191(c). As evidenced in financial projections submitted with the Plan, the Debtors will apply all projected disposable income for the next five (5) years to make payments under the Plan.

144. The Plan satisfies the third requirements of Section 1191(c) because as evidenced by the financial projections, there is a reasonable likelihood that the Debtors will be able to make all payments under the Plan for the next five years.

      ii.      The Plan Does Not Unfairly Discriminate as to Class 2.

145. Neither Section 1129(b) nor 1191(b) of the Bankruptcy Code set forth a standard for determining "unfair discrimination" but courts typically examine the facts and circumstances of the particular case to determine whether "unfair discrimination" exists. *See In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair

discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances."); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination."); *see In re 203 N. LaSalle St. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established").

146.     Generally, courts have found that a plan unfairly discriminates if similarly situated claims are treated differently *without a reasonable basis for the disparate treatment*.  *See In re Exide Techs.*, 303 B.R. 48, 78 (Bankr. D. Del. 2003) ("The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.").  Conversely, no unfair discrimination exists if, taking into account the particular facts and circumstances of these cases, there is a reasonable basis for the disparate treatment of similar claims.  *See id.* (noting that "in order to confirm the Plan, the Debtor must show that (i) there is a reasonable basis for the Debtor's separate classification [of the classes]… and (ii) that the Debtor cannot confirm a plan absent the separate classification of unsecured claims").  The "unfair discrimination" analysis involves a comparison of the treatment of different classes, and therefore differs from the equal treatment analysis of Section 1123(a)(4) of the Bankruptcy Code, which involves a comparison of the treatment of claims within a particular class.

147.     Here, there are no Classes with similarly situated claims that are receiving different treatment under the Plan.  More specifically, Class 1 and Class 2 do not have similarly situated claims that are receiving different treatment under the Plan.

148.    Thus, the Plan's treatment of Claims and Equity Interests is proper because all similarly situated Holders of Claims and Equity Interests will receive substantially similar treatment.

## CONCLUSION

149.    For the foregoing reasons, the Debtors respectfully request that the Court (a) enter the proposed Confirmation Order, confirming the Plan, (b) overrule the remaining Objection(s), and (c) grant such other and further relief as is just and proper.

Dated: September 6, 2024
         Wilmington, Delaware

**PASHMAN STEIN WALDER HAYDEN, P.C.**

*/s/ Joseph C. Barsalona II*
Joseph C. Barsalona II (No. 6102)
824 North Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 592-6496
Email: jbarsalona@pashmanstein.com

-and-

Amy M. Oden (admitted *pro hac vice*)
Katherine R. Beilin (admitted *pro hac vice*)
Court Plaza South, East Wing
21 Main Street, Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200
Email: aoden@pashmanstein.com
          kbeilin@pashmanstein.com

*Counsel to the Debtors and*
*Debtors in Possession*